# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW ORLEANS EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PACS GROUP, INC., JASON MURRAY, DERICK APT, MICHELLE LEWIS, MARK HANCOCK, JACQUELINE MILLARD, TAYLOR LEAVITT, EVELYN DISLAVER, CITIGROUP GLOBAL MARKETS, INC., J.P. MORGAN SECURITIES, LLC, TRUIST SECURITIES, INC., RBC CAPITAL MARKETS, LLC, GOLDMAN SACHS & CO., LLC, STEPHENS, INC., OPPENHEIMER & CO., INC., UBS SECURITIES, LLC,<br><br>Defendants. | Civil Action No.<br><br>DEMAND FOR JURY TRIAL<br><br>CLASS ACTION |

## CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF THE FEDERAL SECURITIES LAWS

TABLE OF CONTENTS

Page

I.      INTRODUCTION ......................................................................................... 1

II.     NATURE OF THE ACTION ........................................................................ 1

III.    JURISDICTION AND VENUE .................................................................... 6

IV.     COMPANY BACKGROUND ...................................................................... 7

V.      PARTIES ...................................................................................................... 9

        A.      Plaintiff ............................................................................................. 9

        B.      Exchange Act Defendants................................................................. 9

        C.      Securities Act Defendants .............................................................. 10

VI.     SUBSTANTIVE ALLEGATIONS – EXCHANGE ACT CLAIMS .............. 12

        A.      Materially False and Misleading Statements and Omissions Relied Upon by
                Investors During the Class Period.................................................... 12

        B.      The Truth Begins to Emerge ........................................................... 21

        C.      Additional Scienter Allegations Related to Exchange Act Claims...................... 22

        D.      Loss Causation/Economic Loss ...................................................... 24

        E.      Applicability of Presumption of Reliance: Fraud on the Market........................ 24

        F.      No Safe Harbor ............................................................................... 25

COUNT I  FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND
        RULE 10B-5 AGAINST PACS AND THE EXCHANGE ACT INDIVIDUAL
        DEFENDANTS ......................................................................................... 26

COUNT II    FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT
        AGAINST THE EXCHANGE ACT INDIVIDUAL DEFENDANTS ............... 27

VII.    SUBSTANTIVE ALLEGATIONS – SECURITIES ACT CLAIMS............... 28

        A.      Materially False and Misleading Statements and Omissions Contained in
                the SPO Materials ........................................................................... 28

        B.      Events After the SPO ...................................................................... 31

COUNT III  FOR VIOLATION FOR SECTION 11 OF THE SECURITIES ACT AGAINST PACS, THE SECURITIES ACT INDIVIDUAL DEFENDANTS, AND THE UNDERWRITER DEFENDANTS ........................................................................ 33

COUNT IV  FOR VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT AGAINST PACS, THE SECURITIES ACT INDIVIDUAL DEFENDANTS, AND THE UNDERWRITER DEFENDANTS ........................................................................ 34

COUNT V FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT AGAINST THE SECURITIES ACT INDIVIDUAL DEFENDANTS ............................................. 36

VIII.    CLASS ACTION ALLEGATIONS .............................................................. 37

IX.    PRAYER FOR RELIEF ............................................................................... 39

X.    JURY DEMAND ......................................................................................... 39

## I.    INTRODUCTION

Plaintiff New Orleans Employees' Retirement System ("New Orleans" or the "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of the public U.S. Securities and Exchange Commission ("SEC") filings of PACS Group, Inc. ("PACS" or the "Company"), Company press releases, conference call transcripts, investor presentations, analyst and media reports, and other public reports and information regarding the Company.  Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

## II.    NATURE OF THE ACTION

1.    This federal securities class action, which asserts both strict liability claims under the Securities Act of 1933 (the "Securities Act") and fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act").  This action arises from Defendants' (as defined herein) materially false and misleading statements and omissions to investors regarding PACS' rapid growth and profitability, primarily driven by the Company's manipulation of billing practices that exploited taxpayer-funded programs.

2.    This action is brought on behalf of:

(a)    All person or entities who purchased or otherwise acquired PACS securities between April 11, 2024 and November 5, 2024, inclusive (the "Class Period"), against PACS and the Exchange Act Individual Defendants (as defined herein) for violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder; and

(b)     All persons and entities that purchased or otherwise acquired PACS common stock pursuant, or traceable, or both, to the SPO Materials (as defined herein) issued in connection with PACS' September 2024 secondary public offering (the "SPO"), for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, against PACS and the Securities Act Defendants (as defined herein).

3.     Under Sections 11, 12(a)(2), and 15 of the Securities Act, the Securities Act Defendants are liable for materially false and misleading statements contained in the SPO Materials.  Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional reckless conduct as to the Securities Act claims.

4.     Founded in 2013, PACS is one of the largest operators of skilled nursing facilities ("SNFs") and post-acute care facilities in the United States.  Headquartered in Farmington, Utah, PACS serves over 27,000 patients daily across its national portfolio of approximately 280 facilities in 16 states.  The Company operates a range of healthcare services, including long-term care and short-term rehabilitation.

5.     PACS derives most its revenue from government funded programs including Medicare and Medicaid.  Medicare and Medicaid accounted for over 70 percent of PACS' total revenue in 2022 and 2023.  Specifically, for the year ended December 31, 2022, 47.6 percent of PACS' revenue was derived from Medicare, while 30.2 percent of its revenue came from Medicaid.  For the year ended December 31, 2023, Medicare and Medicaid accounted for 38.6 percent and 37.6 percent of total revenue, respectively.

6.     PACS receives higher reimbursement rates from Medicare for treating beneficiaries who require a higher level of skilled care.  The Center for Medicare and Medicaid Services ("CMS") defines skilled care as services like nursing or rehabilitation that "require the skills of

qualified technical or professional health personnel." PACS states that its financial sustainability is driven by high-acuity patients who receive a higher level of care, while lower-acuity patients result in lower payments.

7. Generally, at SNFs, "skilled care" Medicare beneficiaries can drive up to three times more revenue per day than Medicaid. To qualify for the higher paying "skilled care" Medicare coverage, a patient must typically "have spent a minimum of three consecutive inpatient days in the hospital." However, during COVID, CMS waived the hospital-stay requirement to reduce hospital crowding, permitting patients to access Medicare benefits if they showed a need for skilled nursing care (the "COVID Waiver"). Even though potential COVID-19 exposure or a confirmed diagnosis did not qualify a patient for skilled care benefits, PACS leveraged minimal COVID exposure to "flip" entire patient populations from Medicaid to Medicare. Then, PACS could receive enhanced payments for these populations. This practice drove up PACS' revenue with minimal additional costs, which resulted in a Medicare revenue mix significantly higher than that of its competitors.

8. Since 2020, after the onset of the COVID-19 pandemic, PACS reported strong revenue and profit growth, securing its place as one of the largest players in the U.S. SNF market. The Company's net income more than doubled, from $47 million to almost $112 million, in the three-year span from 2021 to 2023. This growth was primarily due to revenues that PACS generated in connection with the COVID Waiver. In fact, it was later revealed that PACS' revenue decreased sharply after COVID Waiver expired in mid-2023. Despite this revenue decline, PACS managed to mask the lost revenues from the COVID Waiver by fraudulently billing for unnecessary treatments and for services never provided to patients.

3

9.      On March 13, 2024, PACS filed with the SEC a registration statement for its April 2024 initial public offering (the "IPO") on Form S-1, which, after three amendments, was declared effective on April 10, 2024 ("IPO Registration Statement").  On April 12, 2024, PACS filed with the SEC a prospectus for the IPO on Form 424B4, which formed part of the IPO Registration Statement (the "IPO Prospectus" and together with the IPO Registration Statement and attendant materials filed or published with these forms, the "IPO Materials").  PACS issued 21,428,572 shares of common stock at $21.00 per share for proceeds to the Company of $450 million. Through the IPO, PACS insiders also sold 3,214,284 shares of their common stock at $21.00 for proceeds of $67.5 million.

10.     Subsequently, on September 3, 2024, PACS filed with the SEC a registration statement for a secondary offering on Form S-1 (the "SPO Registration Statement").  On September 6, 2024, PACS filed with the SEC a prospectus for the SPO on Form 424B4, which formed part of the SPO Registration Statement (the "SPO Prospectus" and together with the SPO Registration Statement and attendant materials filed or published with these forms, the "SPO Materials."  PACS issued 2,777,778 shares of common stock at $36.25 per share for proceeds of $100.7 million to the Company.  Through the SPO, PACS insiders also sold 16,256,704 shares of common stock at $36.25 per share for proceeds of $589.3 million.

11.     The Class Period statements and SPO Materials were materially false and misleading because they falsely represented the factors driving the Company's revenues, profits, and growth while failing to disclose the following adverse facts:

(a)      that PACS inflated its Medicare revenues by misclassifying lower-acuity patients as high-acuity patients that required skilled care in violation of the COVID Waiver rules, thereby securing higher reimbursement rates;

(b)    that after the expiration of the COVID Waiver, PACS inflated its revenues by fraudulently billing for unnecessary treatments and for services never provided to patients;

(c)    that PACS' historical revenues, competitive advantages, and growing market share were the result of systemic, improper, unethical, and/or illegal practices, and, thus, unsustainable;

(d)    that PACS' risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and

(e)    as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

12.    As a result of these materially false and misleading statements and omissions PACS' securities traded at artificially high prices during the Class Period.  Defendants took advantage of these artificially high prices and profited enormously by selling hundreds of millions of dollars' worth of PACS stock through the IPO and SPO.

13.    The truth about PACS' illicit practices, heightened regulatory risks, unsustainable revenues, and other undisclosed issues began to emerge on November 4, 2024, when Hindenburg Research ("Hindenburg") published a report concerning PACS (the "Hindenburg Report").  This report detailed several allegations against the Company, including evidence of PACS' misuse of COVID waivers to inflate Medicare reimbursements as well as other unsustainable revenue practices which misrepresented the Company's financial health to investors.

14.    On this news, PACS' share price ***dropped $11.93 per share, or 27.8 percent,*** to close at $31.01 per share on November 4, 2024.  Despite this report, and as discussed *infra*, the

5

extent of the Company's reliance on unsustainable and potentially unlawful practices to drive revenue growth was not fully disclosed to the public.

15.    Then, on November 6, 2024, before the opening of trading, the Company announced that it would delay the release of its third-quarter 2024 financial results.  PACS stated that the postponement was due to the Company's Audit Committee conducting an investigation into recent third-party allegations concerning its reimbursement and referral practices.  PACS also disclosed that it had received civil investigative demands from the federal government regarding these practices, which it stated may or may not have been related to the recent third-party report.

16.    On this news, PACSs share price ***dropped $11.45 per share, or 38.8 percent,*** to close at $18.09 per share on November 6, 2024.

17.    As a result of these disclosures, the prices of PACS securities dropped significantly causing hundreds of millions of dollars in damages to the Company's investors.

## III.    JURISDICTION AND VENUE

18.    The claims asserted herein arise under Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (*see* 17 C.F.R. § 240.10b-5).

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.    Personal jurisdiction and venue are proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(c)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b).  PACS' stock trades on the New York Stock Exchange ("NYSE") located in

this District.  Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

21.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.    COMPANY BACKGROUND

22.    Founded in 2013 by Defendants Jason Murray ("Murray") and Mark Hancock ("Hancock"), PACS initially established itself as a provider of skilled nursing facilities to meet the growing demand for long-term care and rehabilitation services across the United States.  As it expanded, PACS adopted a "turnaround" business model, acquiring underperforming SNFs and enhancing their financial performance.  Today, PACS operates a range of healthcare services, including long-term care and short-term rehabilitation.

23.    PACS primarily operates in the highly regulated and competitive U.S. healthcare market, where it serves more than 27,000 patients daily through its network of approximately 280 facilities across 16 states.  The Company employs over 40,000 staff members, including healthcare professionals and administrative personnel.

24.    Through its Medicare and Medicaid partnerships, PACS provides a variety of programs to meet patients' unique medical needs, with an emphasis on maximizing reimbursement rates to support its rapid growth trajectory.  With the onset of the COVID-19 pandemic in 2020, the introduction of CMS' COVID Waiver became a significant boon for PACS, allowing the Company to capitalize on increased Medicare reimbursements and fueling its rapid growth.  The IPO Materials stated that the Company's net income more than doubled from 2021 through 2023 ($47 million to almost $112 million).

25.     PACS held its IPO in April 2024.  On March 13, 2024, PACS filed with the SEC the registration statement for the initial public offering on Form S-1, which, after three amendments, was declared effective on April 10, 2024.  On April 12, 2024, PACS filed the IPO Prospectus for the IPO with the SEC, which formed part of the IPO Registration Statement. Pursuant to the IPO Registration Statement, PACS sold to the investing public 21,428,572 shares of PACS common stock at $21 per share, for proceeds of $450 million.  Through the IPO, Defendants Murray and Hancock also sold 3,214,284 shares of their PACS stock at $21 per share for proceeds of $67.5 million.

26.     In September 2024, PACS held a secondary public offering of its stock.  On September 3, 2024, PACS filed with the SEC a registration statement for the SPO on Form S-1. On September 06, 2024, PACS filed the prospectus for the SPO with the SEC, which formed part of the SPO Registration Statement.  Pursuant to the SPO Registration Statement, PACS issued 2,777,778 shares of common stock at $36.25 per share for proceeds of $100.7 million to the Company.  Through the SPO, Defendants Murray and Hancock also sold 16,256,704 shares of their PACS stock at $36.25 per share for proceeds of $589.3 million.

27.     Unbeknownst to investors, leading up to and at the time of the IPO, PACS' historical revenue and profit growth as represented in their IPO Materials was artificially inflated by the Company's systemic, improper, unethical, and unsustainable practices in violation of applicable laws and regulations.  Throughout the Class Period and at the time of the SPO, the price of PACS securities was similarly inflated by PACS' continuous misrepresentations.  At all relevant times, these undisclosed practices exposed the Company to a severe, but unrevealed, risk of reputational and regulatory scrutiny and diminished business and financial prospects.

## V.    PARTIES

### A.    Plaintiff

28.    Plaintiff New Orleans purchased or otherwise acquired PACS securities during the Class Period, and in connection with the SPO and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B.    Exchange Act Defendants

29.    Defendant PACS Group, Inc. is incorporated in Delaware and headquartered in Farmington, Utah, with a network of facilities across 16 states.  PACS' securities trade on the NYSE under the ticker symbol "PACS."

30.    Defendant Jason Murray ("Murray") is a co-founder of PACS.  At all relevant times, Murray was PACS' Chief Executive Officer and served as Chairman on PACS' Board of Directors (the "Board").

31.    Defendant Derrick Apt ("Apt") served as PACS' Chief Financial Officer at all relevant times.

32.    Defendants Murray and Apt are collectively referred to hereinafter as the "Exchange Act Individual Defendants."  The Exchange Act Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of PACS' reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, i.e., the market.  The Exchange Act Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Exchange Act Individual Defendants knew that the

9

adverse facts specified herein had not been disclosed to and were being concealed from, the public, and that the positive representations which were being made were then materially false or misleading. The Exchange Act Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Exchange Act Individual Defendants.

33.    The Exchange Act Individual Defendants along with PACS are herein referred to as the "Exchange Act Defendants."

### C.    Securities Act Defendants

34.    Defendant PACS is both an Exchange Act and a Securities Act Defendant.

35.    Defendant Murray is both an Exchange Act and a Securities Act Defendant and signed the SPO Registration Statement.

36.    Defendant Apt is both an Exchange Act and a Securities Act Defendant and signed the SPO Registration Statement.

37.    Defendant Michelle Lewis was PACS' Chief Accounting Officer at all relevant times and signed the SPO Registration Statement.

38.    Defendant Mark Hancock is a co-founder of PACS and was Director and Executive Vice Chairman of the Board at the time of the SPO and signed the SPO Registration Statement.

39.    Defendant Jacqueline Millard was a Director on PACS' Board at the time of the SPO and signed the SPO Registration Statement.

40.    Defendant Taylor Leavitt was a Director on PACS' Board at the time of the SPO and signed the SPO Registration Statement.

41.    Defendant Evelyn Dislaver was a Director on PACS' Board at the time of the SPO and signed the SPO Registration Statement.

42.     The defendants identified in ¶¶ 35-41 above are also referred to herein as the "Securities Act Individual Defendants."

43.     Defendant Citigroup Global Markets Inc. is a financial services company that is headquartered in this District and served as an underwriter on the SPO.

44.     Defendant J.P. Morgan Securities LLC is a financial services company that is headquartered in this District and served as an underwriter on the SPO.

45.     Defendant Truist Securities Inc. is a financial services company that maintains an office and performs significant business in this District and served as an underwriter on the SPO.

46.     Defendant RBC Capital Markets LLC is a financial services company that is headquartered in this District and served as an underwriter on the SPO.

47.     Defendant Goldman Sachs & Co. LLC is a financial services company that is headquartered in this District and served as an underwriter on the SPO.

48.     Defendant Stephens Inc. is a financial services company that maintains an office and performs significant business in this District and served as an underwriter on the SPO.

49.     Defendant Oppenheimer & Co. Inc. is a financial services company headquartered in this District and served as an underwriter on the SPO.

50.     Defendant UBS Securities LLC is a financial services company that maintains an office and performs significant business in this District and served as an underwriter on the SPO.

51.     The defendants identified in ¶¶ 43-50 (collectively, the "Underwriter Defendants") served as Underwriters for the SPO.  The Underwriter Defendants' failure to conduct adequate due diligence in connection with the SPO and the preparation of the SPO Materials was a substantial factor leading to the harm complained of herein.

52.     All Securities Act Individual Defendants and Underwriter Defendants, along with

PACS, are referred to herein as the "Securities Act Defendants."

53.     All defendants, including both Exchange Act Defendants and Securities Act

Defendants, are collectively referred to herein as "Defendants."

## VI.    SUBSTANTIVE ALLEGATIONS – EXCHANGE ACT CLAIMS

### A.    Materially False and Misleading Statements and Omissions Relied Upon by Investors During the Class Period

54.     The Class Period begins on April 11, 2024, the day PACS stock began to trade

publicly on the NYSE.

55.     The IPO Materials, which PACS filed with the SEC in March and April 2024, stated

in relevant part that PACS' success and growth was rooted in and relied on, among other factors,

its business model based on attracting higher-acuity patients:

> Our business model, like those of some other for-profit operators, is based in part on attracting higher-acuity patients whom we believe provide us more opportunity to be profitable due to the higher level of services they need and accordingly higher reimbursement rates, and over time our overall patient mix has consistently shifted to higher-acuity and higher-resource utilization patients in most facilities we operate.

56.     The IPO Materials attributed PACS' growth to its expertise in acquiring

underperforming SNFs and converting them to higher acuity, high-value add short-term

transitional care SNFs, stating:

> Our significant historical growth has been primarily driven by implementing our expertise in acquiring underperforming long-term custodial care SNFs and converting them into higher acuity, high value-add short-term transitional care SNFs.

57.     PACS discussed the highly regulated industry and strict regulatory compliance

obligations it faced and acknowledged the risk that failing to meet its compliance obligations

would have on the business stating:

We operate in a highly regulated industry with stringent regulatory compliance obligations, which requires robust regulatory compliance operations. **Failure to operate in compliance with applicable laws and regulations could require significant expenditures and result in regulatory deficiencies and other regulatory penalties.** PACS Services functions to support our regulatory compliance obligations across our organization, including through controlled billing and cost reporting practices and legal, risk management, and compliance support. (**emphasis added**).

58.    The IPO Materials also touted the Company's "robust culture of compliance":

***Robust culture of compliance.*** We focus on instilling a unified, cohesive culture of innovation and compliance that we believe provides consistency in our results and confidence in our facilities as an attractive care option for patients. Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a foundation of trust and collaboration that makes us a natural choice for payors.

*        *        *

We believe our technology and internally developed dashboards help to facilitate better patient care, risk management, regulatory compliance, staffing, and resource allocation.

*        *        *

We also believe our size and scale has provided us with the ability to negotiate favorable contracts with managed care and other payor sources, the ability to navigate stringent regulatory compliance obligations and withstand potential reimbursement and regulatory industry dynamics, and the ability to leverage real estate value for liquidity and growth.

59.    The IPO Materials highlighted the steps PACS stated it was taking to meet its

compliance obligations:

We have internal compliance professionals and invest in other resources to help us comply with various requirements of federal and private healthcare programs.

*        *        *

Our compliance program includes, among other things, (1) policies and procedures that take into account applicable laws, regulations, sub-regulatory guidance and industry practices and customs that govern the clinical, reimbursement and operational aspects of our operating subsidiaries; (2) training about our compliance process for employees throughout our organization, our directors and officers, and training about Medicare and Medicaid laws, fraud and abuse prevention, clinical standards and practices, and claim submission and reimbursement policies and

13

procedures for appropriate employees; and (3) internal controls that monitor, among other things, the accuracy of claims, reimbursement submissions, cost reports and source documents, provision of patient care, services, and supplies as required by applicable standards and laws, accuracy of clinical assessment and treatment documentation, and implementation of judicial and regulatory requirements (i.e., background checks, licensing and training).

60.    The IPO Materials further emphasized the Company's efforts to rectify any errors

or failures it discovered regarding its compliance:

While we have not experienced any material compliance issues to date, from time to time, our systems and internal controls highlight potential compliance issues, which we investigate as they arise. We similarly investigate concerns that are reported to us by employees or other persons. When errors or compliance failures are identified, we seek to rectify them as appropriate.

61.    The IPO Materials also included the following false and misleading risk factors:

We depend upon reimbursement from third-party payors, and our revenue, financial condition and results of operations could be negatively impacted by any changes in the acuity mix of patients in our facilities as well as changes in payor mix and payment methodologies and new cost containment initiatives by third-party payors.

*        *        *

We face numerous risks related to expiration of the COVID-19 public health emergency (PHE) expiration and surrounding wind-down and uncertainty, which could, individually or in the aggregate, have a material adverse effect on our business, financial condition, liquidity, results of operations and prospects.

*        *        *

We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs.

*        *        *

If we do not achieve or maintain competitive quality of care ratings from CMS or private organizations engaged in similar rating activities, our business may be negatively affected.

*        *        *

We rely on payments from third-party payors, including Medicare, Medicaid and other governmental healthcare programs and private insurance organizations. If

coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.

62.    On May 13, 2024, PACS issued a press release announcing its results for the first fiscal quarter ended March 31, 2024.  In the press release, PACS issued guidance that its revenue would be between $3.65 billion and $3.75 billion for the year ended December 31, 2024.  In the press release, PACS stated that it had a "very strong quarter, highlighted by 158 of our facilities having a 4 or 5 star CMS Quality Measure rating.  We believe this is a key driver of our revenue growth year over year of 31.9%."

63.    On the same day, the Company filed with the SEC a Form 10-Q reporting the Company's financial and operational results for the quarter (the "Q1 2024 10-Q") which included substantially the same false and misleading risk factors as those in the IPO Materials as discussed *infra* ¶ 61.

64.    Appended as an exhibit to the Q1 2024 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Exchange Act Individual Defendants certified that "[t]he [Q1 2024 10-Q] fully complies with the requirements of section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q1 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

65.    The following day, the Company hosted an earnings call for the quarter (the "Q1 2024 Earnings Call").  During the Q1 2024 Earnings Call, Defendant Murray reiterated that "our teams continue to excel in caring for their residents" and that "[t]his kind of effort is the most important factor in our financial strength and revenue growth."  Defendant Murray touted the Company's revenue growth:

Our revenue was driven higher by several factors when compared with the same quarter last year. In addition to increasing occupancy, we also saw revenue per patient day increases.

\*        \*        \*

Outlook for continued growth remains strong, with a robust acquisition pipeline and continued improvement both clinically and financially in the operations we've recently acquired.

\*        \*        \*

66.    On the Q1 2024 Earnings Call, Defendant Apt stated:

We attribute our revenue growth to adding 5,194 beds to the company over the past year, which represents 35.3% increase in patient days. Additionally, we realized a meaningful improvement on our revenue per patient day over the same time period. We continued the growth of our overall bed count into the first quarter of this year with adding 10 new operations. Our local teams have been making clinical improvements, which is leading to increased occupancy and stabilization of the financial performance of these facilities.

Additionally, our average Medicare revenue per patient day remained strong through Q1 at both our Ramping and Mature facilities at $969 and $938 respectively, compared to '23 where our average Medicare revenue per patient day at Ramping and Mature was 836 and 846, respectively.

67.    On August 12, 2024, PACS issued a press release announcing its results for the second quarter ended June 30, 2024. In the press release, PACS raised its full year 2024 Revenue guidance providing that it believed Revenue would now be between $3.85 billion and $3.95 billion for the year ended December 31, 2024. Defendant Murray stated, "We had another strong quarter, again highlighted by 165 of our facilities having a 4 or 5 star CMS Quality Measures rating. We believe this is a key driver of our revenue growth in the second quarter of 2024 of 29.1% or $221.2 million as compared to the second quarter of 2023." Defendant Apt commented on the Company's revenue growth stating:

Our revenue growth was also driven in significant part by our adding 3,947 operational beds to the company over the twelve months ending June 30, 2024, leading to a 24.8% increase in patient days for the second quarter of 2024 compared

to the same quarter of the prior year. Additionally, our occupancy remained strong across all facilities — 91.0% in the second quarter of 2024.

68.    On the same day, the Company also filed with the SEC a Form 10-Q reporting the Company's financial and operational results for the quarter (the "Q2 2024 10-Q") which included substantially the same false and misleading risk factors as those in the IPO Materials as discussed infra ¶61.

69.    Appended as an exhibit to the Q2 2024 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Exchange Act Individual Defendants certified that "[t]he [Q2 2024 10-Q] fully complies with the requirements of section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q2 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

70.    That same day, the Company hosted an earnings call for the quarter ended June 30, 2024, (the "Q2 2024 Earnings Call"). During the Q2 2024 Earnings Call, Defendant Apt stated the following:

> The occupancy has not seen a cyclical seasonal drop that we did most summers. The occupancies remain strong. The skilled mix is [sic] hung in there. And most importantly, our revenue per patient day continues to grow with capturing the acuity mix across the patient population. So really the EBITDA uptick is driven from that.
>
> *      *      *
>
> But as you see, our Medicare rate for the first half of the year, we were able to drive up, I believe, 9 percent, 9.5 percent. And really, that comes from capturing higher acuity . . . [W]e're getting rewarded financially for taking care of those clinical needs of the higher acuity patients.

71.    On the Q2 2024 Earnings Call, Defendant Murray highlighted the Company's revenue growth, stating that "[t]he improvement of clinical outcomes is truly the most important factor in our financial strength" and that "[o]utlook for continued growth remains strong with a

robust acquisition pipeline and continued improvements both clinically and financially in the operations we've recently acquired."

72.    On September 6, 2024, PACS filed a prospectus on Form 424B4 in connection with the SPO.  The SPO Prospectus also included substantially the same false and misleading risk factors as those in the IPO Materials as discussed *infra* ¶ 61.

73.    The SPO Prospectus stated the following false and/or misleading statements regarding the Company's regulatory compliance:

> We operate in a highly regulated industry with stringent regulatory compliance obligations, which requires robust regulatory compliance operations. Failure to operate in compliance with applicable laws and regulations could require significant expenditures and result in regulatory deficiencies and other regulatory penalties. PACS Services functions to support our regulatory compliance obligations across our organization, including through controlled billing and cost reporting practices and legal, risk management, and compliance support.
>
> *        *        *
>
> ***Robust culture of compliance.*** We focus on instilling a unified, cohesive culture of innovation and compliance that we believe provides consistency in our results and confidence in our facilities as an attractive care option for patients. Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a foundation of trust and collaboration that makes us a natural choice for payors.
>
> *        *        *
>
> The SNF industry is highly regulated with stringent regulatory compliance obligations. In the ordinary course of business, providers are subject to federal, state and local laws and regulations relating to, among other things, billing and reimbursement, relationships with vendors, business relationships with physicians and other healthcare providers and facilities, as well as licensure, accreditation, enrollment, quality, adequacy of care, physical plant, life safety, personnel, staffing and operating requirements. Changes in or new interpretations of existing laws and regulations may have a significant impact on revenue, costs and business operations of providers and other industry participants. In addition, governmental and other authorities periodically inspect the SNFs, senior living facilities and outpatient rehabilitation agencies to verify continued compliance with applicable regulations and standards, and may impose citations and other regulatory penalties for regulatory deficiencies. Such regulatory penalties include but are not limited to civil monetary penalties, temporary payment bans, suspension or revocation of a state

operating license and loss of certification as a provider in the Medicare or Medicaid program, any of which may be temporary or permanent in nature. This regulatory environment and related enforcement can have an adverse effect on providers and other industry participants.

*    *    *

We operate in a highly regulated industry with stringent regulatory compliance obligations, and are subject to extensive and complex laws and government regulations. If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance.

*    *    *

We have internal compliance professionals and invest in other resources to help us comply with various requirements of federal and private healthcare programs. Our compliance program includes, among other things, (1) policies and procedures that take into account applicable laws, regulations, sub-regulatory guidance and industry practices and customs that govern the clinical, reimbursement and operational aspects of our operating subsidiaries; (2) training about our compliance process for employees throughout our organization, our directors and officers, and training about Medicare and Medicaid laws, fraud and abuse prevention, clinical standards and practices, and claim submission and reimbursement policies and procedures for appropriate employees; and (3) internal controls that monitor, among other things, the accuracy of claims, reimbursement submissions, cost reports and source documents, provision of patient care, services, and supplies as required by applicable standards and laws, accuracy of clinical assessment and treatment documentation, and implementation of judicial and regulatory requirements (i.e., background checks, licensing and training).

*    *    *

While we have not experienced any material compliance issues to date, from time to time, our systems and internal controls highlight potential compliance issues, which we investigate as they arise. We similarly investigate concerns that are reported to us by employees or other persons. When errors or compliance failures are identified, we seek to rectify them as appropriate. Depending on the circumstances, in order to rectify a failure, we may be required to take certain actions, including but not limited to self-reporting them to applicable federal and state regulators, government agencies or other third parties, disgorging or paying money to the government or other third parties, and implementing changes to systems, personnel or other resources in order to mitigate the risk of recurrence, all of which could result in significant costs. Such issues, and any failure to properly remediate such issues or to timely identify and refund overpayments, for instance, could result in potential federal False Claims Act (FCA) liability and could have a

19

material adverse effect on our business, financial condition and results of operations. Other significant compliance failures could have similar negative impacts.

*    *    *

74.    The SPO prospectus also contained the following statements regarding the Company's growth and financials:

> We have built a multi-faceted growth strategy with multiple organic and inorganic levers to help drive our growth and capitalize on the favorable industry dynamics.

*    *    *

> Our portfolio has a healthy foundation for strong embedded organic growth.

*    *    *

> For the six months ended June 30, 2024 and 2023, we generated total revenue of $1.9 billion and $1.5 billion, respectively. A substantial portion of our revenue is generated from payments from third-party payors, including Medicare and Medicaid, which represent our largest sources of revenue and accounted for 36.6% and 38.4% of our total revenue for the six months ended June 30, 2024, respectively, and 44.8% and 32.9% of our total revenue for the six months ended June 30, 2023, respectively. For the six months ended June 30, 2024, we generated total net income of $38.2 million, total operating expense of $1.8 billion and Adjusted EBITDA of $188.2 million. For the six months ended June 30, 2023, we generated total net income of $58.8 million, total operating expense of $1.4 billion and Adjusted EBITDA of $122.4 million. For the year ended December 31, 2023, we generated total revenue of $3.1 billion, and Medicare and Medicaid accounted for 38.6% and 37.6% of our total revenue, respectively. For the year ended December 31, 2022, we generated total revenue of $2.4 billion, and Medicare and Medicaid accounted for 47.6% and 30.2% of our total revenue, respectively. For the year ended December 31, 2023, we generated total net income of $112.9 million, total operating expense of $2.9 billion and Adjusted EBITDA of $237.5 million. For the year ended December 31, 2022, our total operating expenses were $2.2 billion, and we generated net income of $150.5 million and Adjusted EBITDA of $255.5 million.

75.    The statements in ¶¶ 55-74 were materially false and misleading when made because they failed to disclose the following adverse facts that existed at the time they were made:

20

(a)    that PACS inflated its Medicare revenues by misclassifying lower-acuity patients as high-acuity patients that required skilled care in violation of the COVID Waiver rules, thereby securing higher reimbursement rates;

(b)    that after the expiration of the COVID Waiver, PACS inflated its revenues by fraudulently billing for unnecessary treatments and for services never provided to patients;

(c)    that PACS' historical revenues, competitive advantages, and growing market share were the result of systemic, improper, unethical, and/or illegal practices, and, thus, unsustainable;

(d)    that PACS' risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and

(e)    as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

### B.    The Truth Begins to Emerge

76.    On November 4, 2024, Hindenburg released a report alleging that PACS had engaged in improper practices, including manipulating Medicare billing through the misuse of a COVID-era waiver, which drove a significant portion of the Company's revenues.  The Hindenburg Report also claimed that PACS inflated its Medicare revenue by inappropriately classifying lower-acuity patients as high-acuity skilled care patients, thereby securing higher reimbursement rates to bolster its financial performance.  The Hindenburg Report claimed that after the expiration of the COVID Waiver, PACS engaged in further fraudulent practices to defraud CMS, such as billing for unnecessary treatments and for treatments that were never actually performed.  Additionally, the Hindenburg Report accused PACS of misrepresenting staffing levels and qualifications to regulators to meet minimum staffing requirements and increase facility

ratings and state bonuses.  These allegations suggest that PACS' historical revenues, competitive advantages, and growing market share were the result of systemic, improper, unethical, and/or illegal practices, rendering them unsustainable and misleading.

77.    On this news, PACS share price ***dropped $11.93 per share, or 27 percent,*** to close at $31.01 per share on November 4, 2024.  Despite this report, and as discussed *infra*, the extent of the Company's reliance on unsustainable and potentially unlawful practices to drive revenue growth was not fully disclosed to the public.

78.    Then, on November 6, 2024, the Company announced that it would delay the release of its third-quarter 2024 financial results.  PACS stated that the postponement was due to the Company's Audit Committee conducting an investigation into recent third-party allegations concerning its reimbursement and referral practices.  PACS also disclosed that it had received civil investigative demands from the federal government regarding these practices, which it stated may or may not have been related to the recent third-party report.

79.    On this news, PACS share price ***dropped $11.45 per share, or 38.8 percent,*** to close at $18.09 per share on November 6, 2024.

80.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**C.    Additional Scienter Allegations Related to Exchange Act Claims**

81.    During the Class Period, as alleged herein, the Exchange Act Individual Defendants acted with scienter in that the Exchange Act Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and

knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

82.     The Exchange Act Individual Defendants permitted PACS to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

83.     As set forth herein, the Exchange Act Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding PACS, their control over, receipt, or modification of PACS' allegedly materially misleading statements and omissions, or their positions with the Company that made them privy to confidential information concerning PACS, participated in the fraudulent scheme alleged herein.

84.     Moreover, Defendant Murray had the motive and opportunity to commit fraud during the Class Period.   While the price of PACS common stock was artificially inflated, Defendant Murray sold hundreds of millions of dollars' worth of shares through the Company's IPO and SPO.   Defendant Murray's hundreds of millions of dollars' worth of insider sales were suspicious in both timing and amount, as all were executed before any of the fraudulent information alleged herein was revealed to the market.

85.     The Exchange Act Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of PACS securities by disseminating materially false and misleading statements or concealing material adverse facts. The scheme deceived the investing public regarding PACS' business, operations, and management and the intrinsic value of PACS securities and caused Plaintiff and members of the Class to purchase PACS securities at artificially inflated prices.

### D.  Loss Causation/Economic Loss

86.  During the Class Period, as detailed herein, PACS and the Exchange Act Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of PACS securities and operated as a fraud or deceit on Class Period purchasers of PACS securities by misrepresenting the Company's business and prospects.  Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of PACS securities declined as the prior artificial inflation came out of the price over time.  As a result of their purchases of PACS securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

### E.  Applicability of Presumption of Reliance: Fraud on the Market

87.  Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)  the omissions and misrepresentations were material;

(c)  the Company's securities traded in an efficient market;

(d)  the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)  Plaintiff and other members of the Class purchased PACS securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

88.  At all relevant times, the markets for PACS securities were efficient for the following reasons, among others:

(a)     as a regulated issuer, PACS filed periodic public reports with the SEC;

(b)     PACS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     PACS was followed by numerous securities analysts employed by a major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     PACS securities were actively traded in an efficient market, including its common stock that was traded on the NYSE under the ticker symbol "PACS."

89.     As a result of the foregoing, the market for PACS securities promptly digested current information regarding PACS from publicly available sources and reflected such information in PACS' securities prices.  Under these circumstances, all purchasers of PACS securities during the Class Period suffered similar injury through their purchase of PACS securities at artificially inflated prices and the presumption of reliance applies.

90.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

### F.     No Safe Harbor

91.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of PACS who knew that the statement was false when made.

**COUNT I**

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against PACS and the Exchange Act Individual Defendants**

92. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

93. During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

94. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of PACS securities during the Class Period.

95.    Plaintiff and Class members have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for PACS securities.  Plaintiff and Class members would not have purchased PACS securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

96.    As a direct and proximate result of Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of PACS securities during the Class Period.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants**

97.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1-91 as if fully set forth herein.

98.    The Exchange Act Individual Defendants acted as controlling persons of PACS within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control the actions of PACS and its employees.  By reason of such conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## VII.    SUBSTANTIVE ALLEGATIONS – SECURITIES ACT CLAIMS

### A.    Materially False and Misleading Statements and Omissions Contained in the SPO Materials

99.    The SPO Materials were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing its preparation.

100.    On September 6, 2024, PACS filed a prospectus on Form 424B4 in connection with the SPO.  The SPO Prospectus also included the same false and misleading risk factors as those in the IPO Materials as discussed *infra* ¶ 61.

101.    The SPO Prospectus stated the following false and/or misleading statements regarding the Company's regulatory compliance:

> We operate in a highly regulated industry with stringent regulatory compliance obligations, which requires robust regulatory compliance operations. Failure to operate in compliance with applicable laws and regulations could require significant expenditures and result in regulatory deficiencies and other regulatory penalties. PACS Services functions to support our regulatory compliance obligations across our organization, including through controlled billing and cost reporting practices and legal, risk management, and compliance support.

*    *    *

> ***Robust culture of compliance.*** We focus on instilling a unified, cohesive culture of innovation and compliance that we believe provides consistency in our results and confidence in our facilities as an attractive care option for patients. Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a foundation of trust and collaboration that makes us a natural choice for payors.

*    *    *

> The SNF industry is highly regulated with stringent regulatory compliance obligations. In the ordinary course of business, providers are subject to federal, state and local laws and regulations relating to, among other things, billing and reimbursement, relationships with vendors, business relationships with physicians and other healthcare providers and facilities, as well as licensure, accreditation,

enrollment, quality, adequacy of care, physical plant, life safety, personnel, staffing and operating requirements. Changes in or new interpretations of existing laws and regulations may have a significant impact on revenue, costs and business operations of providers and other industry participants. In addition, governmental and other authorities periodically inspect the SNFs, senior living facilities and outpatient rehabilitation agencies to verify continued compliance with applicable regulations and standards, and may impose citations and other regulatory penalties for regulatory deficiencies. Such regulatory penalties include but are not limited to civil monetary penalties, temporary payment bans, suspension or revocation of a state operating license and loss of certification as a provider in the Medicare or Medicaid program, any of which may be temporary or permanent in nature. This regulatory environment and related enforcement can have an adverse effect on providers and other industry participants.

*        *        *

We operate in a highly regulated industry with stringent regulatory compliance obligations, and are subject to extensive and complex laws and government regulations. If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance.

*        *        *

We have internal compliance professionals and invest in other resources to help us comply with various requirements of federal and private healthcare programs. Our compliance program includes, among other things, (1) policies and procedures that take into account applicable laws, regulations, sub-regulatory guidance and industry practices and customs that govern the clinical, reimbursement and operational aspects of our operating subsidiaries; (2) training about our compliance process for employees throughout our organization, our directors and officers, and training about Medicare and Medicaid laws, fraud and abuse prevention, clinical standards and practices, and claim submission and reimbursement policies and procedures for appropriate employees; and (3) internal controls that monitor, among other things, the accuracy of claims, reimbursement submissions, cost reports and source documents, provision of patient care, services, and supplies as required by applicable standards and laws, accuracy of clinical assessment and treatment documentation, and implementation of judicial and regulatory requirements (i.e., background checks, licensing and training).

*        *        *

While we have not experienced any material compliance issues to date, from time to time, our systems and internal controls highlight potential compliance issues, which we investigate as they arise. We similarly investigate concerns that are reported to us by employees or other persons. When errors or compliance failures

are identified, we seek to rectify them as appropriate. Depending on the circumstances, in order to rectify a failure, we may be required to take certain actions, including but not limited to self-reporting them to applicable federal and state regulators, government agencies or other third parties, disgorging or paying money to the government or other third parties, and implementing changes to systems, personnel or other resources in order to mitigate the risk of recurrence, all of which could result in significant costs. Such issues, and any failure to properly remediate such issues or to timely identify and refund overpayments, for instance, could result in potential federal False Claims Act (FCA) liability and could have a material adverse effect on our business, financial condition and results of operations. Other significant compliance failures could have similar negative impacts.

102.  The SPO Prospectus also contained the following statements regarding the

Company's growth and financials:

We have built a multi-faceted growth strategy with multiple organic and inorganic levers to help drive our growth and capitalize on the favorable industry dynamics.

\*        \*        \*

Our portfolio has a healthy foundation for strong embedded organic growth.

\*        \*        \*

For the six months ended June 30, 2024 and 2023, we generated total revenue of $1.9 billion and $1.5 billion, respectively. A substantial portion of our revenue is generated from payments from third-party payors, including Medicare and Medicaid, which represent our largest sources of revenue and accounted for 36.6% and 38.4% of our total revenue for the six months ended June 30, 2024, respectively, and 44.8% and 32.9% of our total revenue for the six months ended June 30, 2023, respectively. For the six months ended June 30, 2024, we generated total net income of $38.2 million, total operating expense of $1.8 billion and Adjusted EBITDA of $188.2 million. For the six months ended June 30, 2023, we generated total net income of $58.8 million, total operating expense of $1.4 billion and Adjusted EBITDA of $122.4 million. For the year ended December 31, 2023, we generated total revenue of $3.1 billion, and Medicare and Medicaid accounted for 38.6% and 37.6% of our total revenue, respectively. For the year ended December 31, 2022, we generated total revenue of $2.4 billion, and Medicare and Medicaid accounted for 47.6% and 30.2% of our total revenue, respectively. For the year ended December 31, 2023, we generated total net income of $112.9 million, total operating expense of $2.9 billion and Adjusted EBITDA of $237.5 million. For the year ended December 31, 2022, our total operating expenses were $2.2 billion, and we generated net income of $150.5 million and Adjusted EBITDA of $255.5 million.

103.    The statements in ¶¶ 100-102 were materially false and misleading when made because they failed to disclose the following adverse facts that existed prior to and at the time of the SPO:

(a)    that PACS inflated its Medicare revenues by misclassifying lower-acuity patients as high-acuity patients that required skilled care in violation of the COVID Waiver rules, thereby securing higher reimbursement rates;

(b)    that after the expiration of the COVID Waiver, PACS inflated its revenues by fraudulently billing for unnecessary treatments and for services never provided to patients;

(c)    that PACS' historical revenues, competitive advantages, and growing market share were the result of systemic, improper, unethical, and/or illegal practices, and, thus, unsustainable;

(d)    that PACS' risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and

(e)    as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

## B.    Events After the SPO

104.    On November 4, 2024, Hindenburg released a report alleging that PACS had engaged in improper practices, including manipulating Medicare billing through the misuse of a COVID-era waiver, which drove a significant portion of the Company's revenues.    The Hindenburg Report also claimed that PACS inflated its Medicare revenue by inappropriately classifying lower-acuity patients as high-acuity skilled care patients, thereby securing higher reimbursement rates to bolster its financial performance.    The Hindenburg Report claimed that after the expiration of the COVID Waiver, PACS engaged in further fraudulent practices to defraud

CMS, such as billing for unnecessary treatments and for treatments that were never actually performed. Additionally, the Hindenburg Report accused PACS of misrepresenting staffing levels and qualifications to regulators to meet minimum staffing requirements and increase facility ratings and state bonuses. These allegations suggested that PACS' historical revenues, competitive advantages, and growing market share were the result of systemic, improper, unethical, and/or illegal practices, rendering them unsustainable. Despite this report, and as discussed *infra*, the extent of the Company's reliance on unsustainable and potentially unlawful practices to drive revenue growth was not fully disclosed to the public. Despite this report, and as discussed *infra*, the extent of the Company's reliance on unsustainable and potentially unlawful practices to drive revenue growth was not fully disclosed to the public.

105. On November 6, 2024, the Company announced that it would delay the release of its third-quarter financial results. PACS stated that the postponement was due to the Company's Audit Committee conducting an investigation into recent third-party allegations concerning its reimbursement and referral practices. PACS also disclosed that it had received civil investigative demands from the federal government regarding these practices, which it stated may or may not have been related to the recent third-party report.

106. Based on the events and disclosures, including those described above, which occurred after the SPO, statements made in the SPO Materials were materially false or misleading. Subsequent to the SPO, the price of PACS common stock declined substantially. By November 20, 2024, PACS common stock closed at $17.25 per share, ***a 52 percent decline*** from the SPO price.

107.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## COUNT III

**For Violation for Section 11 of the Securities Act Against PACS, the Securities Act Individual Defendants, and the Underwriter Defendants**

108.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1-91, 99-107 as if fully set forth herein.

109.    This Count is brought under Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

110.    The SPO Materials contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein not misleading, and omitted to state material facts required to be stated therein.

111.    PACS is the registrant for the SPO. Defendants were responsible for the contents and dissemination of the SPO Materials. Each of the Securities Act Individual Defendants signed or authorized the signing of the SPO Materials on their own behalf. The Underwriter Defendants marketed and underwrote the SPO and sold the majority of PACS stock issued in the SPO to the Class.

112.    As the issuer of the shares, PACS is strictly liable to the Class for the SPO Materials' material misstatements and omissions. Signatories of the SPO Materials, and possibly other Defendants, may also be strictly liable the Class for such material misstatements and omissions. None of the defendants made a reasonable investigation or possessed reasonable

33

grounds to believe that the statements in the SPO Materials were complete, accurate, or non-misleading.

113.     Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which these claims are based to the time that Plaintiff filed this action.  Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this action.

## COUNT IV

### For Violation of Section 12(a)(2) of the Securities Act Against PACS, the Securities Act Individual Defendants, and the Underwriter Defendants

114.     Plaintiff repeats and realleges the allegations contained in ¶¶ 1-91, 99-107 as if fully set forth herein.

115.     This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class, against PACS, the Securities Act Individual Defendants, and the Underwriter Defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 12(a)(2), and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

116.     Each of the Defendants named in this Count were sellers, offerors, or solicitors of purchasers of the Company's securities pursuant to the defective prospectus which respectively formed in relevant part the SPO Materials.  The actions of solicitation by the Securities Act Defendants include participating in the preparation of the false and misleading prospectus and marketing the common stock to investors, including members of the Class.

117.     The SPO Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

118.    Each of the Securities Act Defendants owed members of the Class who purchased or otherwise acquired PACS common stock pursuant to the prospectus issued in connection with the SPO Materials a duty to make a reasonable and diligent investigation of the statements contained in the prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  By virtue of each of the Securities Act Defendants' failure to exercise reasonable care, the prospectus contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

119.    Members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the prospectus issued in connection with the SPO at the time they purchased or otherwise acquired PACS common stock.

120.    By reason of the conduct alleged herein, the Securities Act defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, members of the Class who purchased or otherwise acquired PACS common stock pursuant to the prospectus issued in connection with the SPO Materials sustained substantial damages in connection therewith.  Accordingly, members of the Class who hold the common stock issued pursuant to the prospectus issued in connection with the SPO Materials have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity.  Class members who have sold their PACS common stock seek damages to the extent permitted by law.

121.    Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this complaint is based to the time that Plaintiff filed

this action.  Less than three years have elapsed between the time that the common stock upon which this count is brought were offered to the public and the time Plaintiff filed this action.

## COUNT V

### For Violation of Section 15 of the Securities Act Against the Securities Act Individual Defendants

122.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1-91, 99-107 as if fully set forth herein.

123.    This Count is brought under Section 15 of the Securities Act, 15 U.S.C. §77o, against the Securities Act Individual Defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

124.    As detailed herein, each of the defendants committed primary violations of the Securities Act by engaging in conduct in contravention of Section 11 of the Securities Act.

125.    The Securities Act Individual Defendants were each control persons of PACS by virtue of their positions as directors, senior officers, and/or significant shareholders of the Company.  They each had direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of the Company.  The Company also controlled the Individual Defendants, given the influence and control the Company possessed and exerted over the Individual Defendants and all its employees.

126.    By reason of the conduct alleged herein, the Company and the Securities Act Individual Defendants violated Section 15 of the Securities Act, and plaintiff and the Class have suffered harm as a result.

## VIII.  CLASS ACTION ALLEGATIONS

127.  Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of:

(a)    All persons and entities that purchased or otherwise acquired PACS securities during the period from April 11, 2024 and November 5, 2024, inclusive (the "Class Period"), and were damaged thereby, except those who are excluded below, as against the Defendants (as defined *supra*) for violations of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder; and

(b)    All persons and entities that purchased or otherwise acquired PACS common stock pursuant, or traceable, or both, to the SPO Materials issued in connection with the SPO, for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, against PACS and the Securities Act Defendants.

(c)    Excluded from the Class are: (i) all Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of PACS during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) PACS' employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

128.  The members of the Class are so numerous that joinder is impracticable.  PACS common stock is actively traded on the NYSE and tens of millions of shares were sold in the SPO. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes there are hundreds, if not thousands, of members in the Class.  Record owners and other Class members may be identified from records procured

from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

129.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

(a)    Whether defendants violated the Securities Act or Exchange Act, or both;

(b)    Whether defendants omitted or misrepresented material facts, including whether the SPO Materials misrepresented and/or omitted material information in violation of the Securities Act;

(c)    Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether, with respect to the Exchange Act claims only, the defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the price of PACS securities was artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

130.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from defendants' wrongful conduct.

131.    Plaintiff will adequately protect the Class' interests.  It has retained counsel experienced in securities class action litigation and its interests do not conflict with the Class'.

132.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult,

if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully prays for judgment against defendants as follows:

(A)    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(B)    Awarding Plaintiff and the Class compensatory damages against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

(C)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(D)    Granting such other, further, and/or different relief as the Court deems just and proper.

## X.    JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 21, 2024

**LABATON KELLER SUCHAROW LLP**

/s/ Francis P. McConville
Francis P. McConville
Connor C. Boehme
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com
cboehme@labaton.com

*Counsel for Plaintiff*

## CERTIFICATION

I, Jesse Evans, Jr., as Director of New Orleans Employees' Retirement System ("NOERS"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of NOERS.  I have reviewed a complaint prepared against PACS Group, Inc. ("PACS") alleging violations of the federal securities laws, and authorize the filing of this pleading;

2.      NOERS did not purchase securities of PACS at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      NOERS is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  NOERS fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act;

4.      NOERS's transactions in PACS securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      NOERS has not sought to serve as a lead plaintiff or representative party in any class action under the federal securities laws filed during the last three years;

6.      Beyond its pro rata share of any recovery, NOERS will not accept payment for serving as a lead plaintiff or representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _20ᵗʰ_ day of November, 2024.

Jesse Evans, Jr.,
Director
New Orleans Employees' Retirement System

**EXHIBIT A**

**TRANSACTIONS IN PACS GROUP, INC. SECURITIES**

| Security | Transaction Type | Trade Date | Shares | Share Price | Cost/Proceeds |
|---|---|---|---|---|---|
| Common Stock | Opening Balance | 04/11/24 | 0 | | |
| Common Stock | Purchases | 09/06/24 | 65 | $36.25 | ($2,356) |
| Common Stock | Purchases | 09/06/24 | 550 | $37.03 | ($20,367) |
| Common Stock | Purchases | 09/06/24 | 480 | $37.92 | ($18,202) |
| Common Stock | Purchases | 09/11/24 | 505 | $39.65 | ($20,023) |
| Common Stock | Sales | 11/04/24 | (800) | $32.01 | $25,608 |
| Common Stock | Closing Balance | 11/05/24 | 800 | | |